**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
(212) 209-4800
David J. Molton
William R. Baldiga
Daniel J. Saval
May Orenstein
Kerry Quinn

*Attorneys for the Petitioners*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re:** | **Chapter 15 Case** |
| **Fairfield Sentry Limited, et al.,** | **Case No. 10-13164 (BRL)** |
| **Debtors in Foreign Proceedings.** | **Jointly Administered** |
| **Fairfield Sentry Limited, et al. (In Official Liquidation), acting by and through Kenneth Krys and Christopher Stride, Official Liquidators,** | **Adv. Pro. No.** |
| **Plaintiffs,** | **Complaint** |
| **-against-** | |
| **Bank Hapoalim (Suisse) Ltd. and Beneficial Owners of the Accounts Held in the Name of Bank Hapoalim (Suisse) Ltd. 1-1000,** | |
| **Defendants.** | |

     Plaintiff Fairfield Sentry Limited ("Sentry"), through its attorneys Brown

Rudnick LLP, for the complaint against Defendants, alleges the following based on

personal knowledge or information derived from its books and records or from other sources, including, *inter alia*, court filings and statements of governmental agencies and other parties.

**PRELIMINARY STATEMENT**

1.      This action and similar actions brought by Sentry have been authorized by Sentry's court-appointed liquidators to recover payments made by Sentry for the redemption of Sentry shares prior to December 2008.  Sentry and its affiliate funds, Fairfield Sigma Limited and Fairfield Lambda Limited, were created as a means for private investment in managed accounts established with Bernard L. Madoff Investment Securities LLC ("BLMIS"), a broker dealer purportedly providing investment advisory services.  Following revelations in December 2008 that Bernard L. Madoff ("Madoff"), the proprietor of BLMIS, had been operating a Ponzi scheme, Sentry was involuntarily put into liquidation in proceedings commenced in the Commercial Division of the High Court of Justice, British Virgin Islands.

2.      From Sentry's inception until the disclosure of Madoff's fraud, substantially all investor funds, net of fees and expenses, raised by Sentry through the sale of its shares were transferred to BLMIS for investment in accounts managed by Madoff.  Prior to December 2008, the voting, participating shares of Sentry, $.01 par value per share (the "Shares") were redeemable in accordance with their terms for a price equal to their "Net Asset Value."  Net Asset Value was to be determined, in accordance with applicable accounting standards, as the value of the assets of Sentry divided by number of Shares outstanding, net of certain expenses ("Net Asset Value").  From time to

time, in order to make payments believed by Sentry to be due upon redemption of Shares

("Redemption Payments"), Sentry withdrew funds from its BLMIS accounts.

3.     At all relevant times, Sentry believed funds received by it from BLMIS

were the proceeds from the sale of securities held by BLMIS for the account of Sentry.

Sentry furthermore believed that the amount, per share, paid by it for each Share

redeemed was equal to the per share Net Asset Value.

4.     At all relevant times, Sentry was mistaken both as to the source of the

funds received by it from BLMIS and the value and existence of assets held for its

account by BLMIS.   Upon information and belief, none of the securities shown on

statements provided to Sentry by BLMIS as being held for Sentry's account existed in

fact.  Furthermore, upon information and belief, amounts withdrawn by Sentry from its

accounts with BLMIS, believed by Sentry to be the proceeds from the sale of securities

held by BLMIS for Sentry, were, in fact, derived from funds obtained by BLMIS from

deposits made by Sentry or from other investors and customers of BLMIS.  As a result of

these mistakes, at all relevant times, the Net Asset Value of each Share redeemed was

miscalculated, and Redemption Payments were mistakenly made for amounts far in

excess of the actual Net Asset Value of Shares redeemed.

5.     During the period from April 14, 2005 through November 19, 2008,

Sentry made Redemption Payments aggregating USD $20,047,108.80 to Defendant Bank

Hapoalim (Suisse) Ltd. ("Bank Hapoalim"). At the time such payments were made,

Sentry mistakenly believed that such payments were in the amount of the Net Asset

Value of the Shares tendered at the time of redemption.   In fact, however, the

Redemption Payments made to Bank Hapoalim far exceeded the actual Net Asset Value

of the Shares redeemed.    Moreover, to the extent that the funds used to pay such Redemption Payments were made with funds that had been withdrawn by Sentry from its BLMIS accounts, such funds were not, as Sentry believed them to be, proceeds of the liquidation of securities held for its account.    On information and belief, any funds obtained by Sentry from BLMIS to make Redemption Payments to Bank Hapoalim were obtained from Sentry investors other than Bank Hapoalim or other investors who had made deposits, directly or indirectly, with BLMIS.

6.    Upon information and belief, Bank Hapoalim has either retained the Redemption Payments made to it by Sentry for its own account and benefit or, alternatively, paid all or some portion of such payments to or for the account of persons or entities for whom Bank Hapoalim may have subscribed for shares of Sentry in the capacity of trustee, agent, representative, nominee or custodian.

7.    In December 2008, it became known to Sentry that BLMIS had been operated for many years by Madoff as a massive Ponzi scheme and that account statements rendered by BLMIS prior to December 2008, showing that Sentry had securities having a market value in excess of $6 billion on account with BLMIS, were entirely fictitious.    Following the revelation of the fraud, Sentry's board of directors suspended any further redemptions of Sentry shares and the calculation of the Net Asset Value.    As of December 2008 and presently, Sentry has approximately 4.7 million shares outstanding.

8.    Sentry's actual assets are estimated to be far less than the amount needed by Sentry to satisfy claims that have been or may be asserted against it.    Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New

4

York for the liquidation of BLMIS (the "BLMIS Trustee"), has asserted claims against Sentry in an adversary proceeding pending before the United States Bankruptcy Court of the Southern District of New York, <u>Picard v. Fairfield Sentry Limited, et al.</u>, No. 08-01789 (BRL) (the "BLMIS Adversary Proceeding"). Pursuant to the complaint filed by in the BLMIS Adversary Proceedings, the BLMIS Trustee seeks recovery from Sentry of approximately $3.2 billion transferred to it from BLMIS, which funds, the BLMIS Trustee alleges, were the misappropriated assets of other direct and indirect investors of BLMIS. A substantial amount of such transferred funds were applied by Sentry to the making of Redemption Payments.

9.      Unless Redemption Payments mistakenly paid to shareholders are recovered by Sentry, Sentry will be unable to satisfy its liabilities and claims that have been made or are expected to be made against it. Moreover, to the extent such liabilities and claims must be satisfied solely from Sentry's current assets, the Defendants will have been unjustly enriched since they will not bear their proportionate share of such liabilities and claims, but rather Defendants would retain a windfall at the expense of other shareholders, claimants and creditors of Sentry.

## <u>JURISDICTION AND VENUE</u>

10.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1334(b), as this adversary proceeding relates to the Chapter 15 proceedings of the above-captioned Debtors, <u>In re Fairfield Sentry Limited, <i>et al.</i></u>, No. 10-13164 (BRL), pending in the Bankruptcy Court for the Southern District of New York. Pursuant to the standing order of reference of the United States District Court for the Southern District of New York,

dated July 10, 1984, all proceedings related to cases under Title 11 of the United States

Code (as amended, the "Bankruptcy Code") are referred to this Court for adjudication.

11.    This is a core proceeding under 28 U.S.C. §§ 157(b)(2) (O) and (P).

Should the Court determine this to be a non-core proceeding, Plaintiff consents to entry

of final judgment and order by this Court.

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

13.    Moreover, this Court has jurisdiction over Bank Hapoalim and any

Beneficial Shareholders by virtue of the legally binding and valid agreements and

representations set forth in one or more Subscription Agreements Bank Hapoalim entered

into with the Sentry (collectively, the "Subscription Agreement").

14.    The Subscription Agreement provides for, *inter alia*, the irrevocable

submission by Bank Hapoalim to the jurisdiction of the New York courts with respect to

any proceeding in respect of Sentry and Bank Hapoalim's consent to service of process

by the mailing of such process to Bank Hapoalim.  Furthermore, by executing the

Subscription Agreement, Bank Hapoalim agreed to all terms and conditions contained

therein, including the express provision that any agreement made by Bank Hapoalim in

the Subscription Agreement would also apply to any other person for whom Bank

Hapoalim was subscribing as trustee, agent, representative, or nominee – i.e., all

Beneficial Shareholders.  Moreover, by executing the Subscription Agreement, Bank

Hapoalim represented that it had all requisite authority from Beneficial Shareholders to

execute and perform any and all obligations on their behalf, and also agreed to indemnify

Sentry for any damages resulting from an assertion by a Beneficial Shareholder that Bank

Hapoalim lacked proper authorization to enter into the Subscription Agreement or perform the obligations thereof.

## PARTIES

15.     Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sentry's registered agent is Codan Trust company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI.   Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the Commercial Division of the High Court of Justice, British Virgin Islands (the "BVI Court").   This action and other similar actions brought by Sentry and its related funds, Fairfield Sigma Limited and Fairfield Lambda Limited, have been authorized by the BVI Court-appointed liquidators of Sentry with the permission of the BVI Court.

16.     Defendant Bank Hapoalim (Suisse) Ltd. ("Bank Hapoalim") was, at all relevant times, a registered holder of Shares.   Upon information and belief, Bank Hapoalim is a corporate entity organized under the laws of Luxembourg and having its head office at 18 Boulevard Royal, 2449 Luxembourg.   Bank Hapoalim subscribed for the purchase of Shares by entering into one or more Subscription Agreements with Sentry (collectively, the "Subscription Agreement").   All purchases of Shares by Bank Hapoalim were subject to the terms of the Subscription Agreement.

17.     Defendants "Beneficial Owners of the Accounts Held in the Name of Bank Hapoalim (Suisse) Ltd. 1-1000" are any persons or entities having a beneficial ownership or interests in Shares of Sentry issued to Bank Hapoalim and on whose behalf

Bank Hapoalim was acting as trustee, agent, representative, or nominee (individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders").

**NOTICE PURSUANT TO FED. R. CIV. P. 44.1**

18.     Issues to be resolved in this case may be determined to be governed by the laws of the British Virgin Islands.   In that event, Plaintiff intends to rely upon the applicable laws of that territory.

**FACTUAL ALLEGATIONS**

19.     Sentry was the largest of all so-called "feeder funds" to maintain accounts with BLMIS.  Its account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of assets supposedly held by BLMIS.  As stated in its offering materials, Sentry's investment objective was to achieve capital appreciation of its assets primarily through investments in BLMIS.  Sentry raised funds for investment in BLMIS by selling its Shares, which were listed on the Irish Stock Exchange in Dublin, to qualified investors.

20.     Substantially all of the funds (some 95%) raised by Sentry from sales of its Shares, net of fees and expenses, were turned over to BLMIS, and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in a split-strike conversion investment strategy.  In accordance with Sentry's Articles of Association and other relevant documents governing Sentry and its Shares, from time to time, Sentry paid to shareholders, for each Share tendered for redemption, an amount that was based on Sentry's Net Asset Value, as it was then calculated.

21.     In calculating Net Asset Value, Sentry used and relied upon account statements rendered from time to time by BLMIS purportedly showing securities or

interests or rights in securities held by BLMIS for the account of Sentry. Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values.

22.     Upon information and belief, the purchases and sales of securities and other transactions shown on the account statements provided by BLMIS as having been made for the account of Sentry never in fact occurred and no investments were ever made by BLMIS for the account of Sentry. Upon information and belief, all assets shown on BLMIS account statements rendered to Sentry were entirely fictitious. Further, upon information and belief, funds deposited by Sentry with BLMIS for the purchase of securities to be held by BLMIS for the account of Sentry were used by Madoff to pay requests for payments or redemptions from other BLMIS account holders or were misappropriated by Madoff for other unauthorized uses.

23.     From time to time, to fund Redemption Payments, Sentry requested funds from BLMIS. Sentry believed that the funds provided to it in response to such requests represented proceeds from the sale or liquidation of securities or positions held for the account of Sentry. Upon information and belief, however, payments made by BLMIS purportedly representing the proceeds of securities transactions were in fact deposits made with BLMIS by Sentry and/or other investors with BLMIS.

24.     During the period from April 14, 2005, through November 19, 2008, Bank Hapoalim received Redemption Payments totaling USD $20,047,108.80 from Sentry in respect of Shares tendered for redemption. The dates and amounts of each Redemption Payment received by Bank Hapoalim are attached hereto as Exhibit A.

25.     On December 11, 2008, the FBI arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multi-billion dollar Ponzi scheme.  United States v. Madoff, No. O8-mj-2735 (S.D.N.Y. filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."  Although Madoff had purported to invest funds obtained from investors and feeder funds in securities, in reality, funds obtained from investors were not used to purchase securities.  Instead, new funds obtained from investors, including funds obtained from Sentry, were misappropriated by Madoff and used to fund withdrawals from accounts held by other investors with BLMIS, including Sentry.  In March 2009, Madoff pleaded guilty to the criminal charges brought against him, and he is now serving a 150-year sentence in federal prison.

26.     On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS.  SEC v. Madoff, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

27.     Following the revelation of the fraud, Sentry's board of directors suspended any further redemptions of Sentry shares and the calculation of the Net Asset

Value. As of December 2008 and presently, Sentry has approximately 4.7 million shares outstanding.

28.    On December 15, 2008, a trustee was appointed for the liquidation of the BLMIS estate.  Proceedings for such liquidation are pending in the Bankruptcy Court for the Southern District of New York under the caption <u>Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities LLC</u>, SIPA Liquidation No. 08-1789 (BRL).

29.    On May 18, 2009, the BLMIS Trustee commenced the BLMIS Adversary Proceeding against Sentry and other defendants.  In the BLMIS Adversary Proceeding, the BLMIS Trustee seeks to recover approximately $3.5 billion from Sentry and others on account of transfers that BLMIS allegedly made to Sentry and other persons during the six year period preceding the filing of the BLMIS liquidation proceedings.  These transfers are alleged by the BLMIS Trustee to have been preferential transfers under Section 547 of the Bankruptcy Code and/or fraudulent transfers under Sections 544 and 548 of the Bankruptcy Code and applicable state law.  The BLMIS Adversary Proceeding is currently pending and the claims asserted therein are unresolved.

30.    On April 21, 2009, shareholders of Sentry applied to the BVI Court for the appointment of a liquidator over Sentry.  On July 21, 2009, Messrs. Kenneth Krys and Christopher Stride were appointed by the BVI Court as the joint liquidators of Sentry (the "Liquidators") in its liquidation proceeding, Matter No. BVIHCV2009/136, which is currently pending before the BVI Court under Part VI, titled "Liquidation," of the Insolvency Act, 2003 of the BVI.

31.     Upon appointment, the Liquidators obtained, among other things, custody and control of Sentry assets, the power to do all acts and execute, in the name and on behalf of Sentry, any deeds, receipts or other documents, and the power to compromise claims, commence litigation and to dispose of property on behalf of Sentry.

32.     Acting in accordance with authority afforded to them as Liquidators, and with the consent of the BVI Court, the Liquidators authorized this and similar actions against redeeming shareholders to be commenced for and in the name of Sentry.

## FIRST CLAIM
### *(Unjust Enrichment- Against Bank Hapoalim)*

33.     Sentry repeats and alleges again the allegations contained in paragraphs 1 through 32 above as if set forth herein.

34.     As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Bank Hapoalim, such withdrawn funds consisted of funds deposited with BLMIS by Sentry and other investors and were not, as Sentry mistakenly believed, proceeds from the sale of securities held by BLMIS for the account of Sentry.

35.     By reason of its receipt of funds deposited by other investors with BLMIS, Bank Hapoalim has been unjustly enriched to the detriment of Sentry, its creditors and the current holders of Shares in Sentry.

36.     It would offend principles of equity and good conscience to permit Bank Hapoalim to retain the Redemption Payments it received from Sentry

37.     Sentry is entitled to recover from Bank Hapoalim a sum equal to the Redemption Payments received by it from Sentry.

## SECOND CLAIM
### *(Unjust Enrichment- Against Beneficial Shareholders)*

38.    Sentry repeats and alleges again the allegations contained in paragraphs 1 through 37 above as if set forth herein.

39.    Upon information and belief, Bank Hapoalim may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreement in the capacity of trustee, agent, representative, or nominee for Beneficial Shareholders.

40.    Upon information and belief, Bank Hapoalim may have paid to or credited some or all of the Redemptions Payments received by it to accounts of Beneficial Shareholders.  As alleged above, any payments received by Beneficial Shareholders upon the redemption of Shares issued to Bank Hapoalim consisted of funds invested with BLMIS by Sentry and other investors and were not, as Sentry mistakenly believed, proceeds from the sale of securities held by BLMIS for the account of Sentry.

41.    To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to Bank Hapoalim in its capacity as trustee, agent, representative, or nominee for a Beneficial Shareholder, such Beneficial Shareholder has been unjustly enriched to the detriment of Sentry, its creditors and the current holders of Shares in Sentry.

42.    It would offend principles of equity and good conscience to permit any Beneficial Shareholders to retain the Redemption Payments made by Sentry.

43.    Sentry is entitled to recover from any Beneficial Shareholders a sum equal to the portion of any Redemption Payments received by them in respect of their interests in Shares of Sentry held by them through Bank Hapoalim.

## THIRD CLAIM
### *(Money Had and Received-Against Bank Hapoalim)*

44.      Sentry repeats and alleges again the allegations contained in paragraphs 1 through 43 above as if set forth herein.

45.      As alleged above, the Redemption Payments received by Bank Hapoalim upon the tender of Shares consisted of funds deposited with BLMIS by Sentry and other investors to BLMIS and were not, as Sentry mistakenly believed, proceeds from the sale of securities held by BLMIS for the account of Sentry.

46.      By reason of its receipt of funds representing the deposits with BLMIS of Sentry and other investors, Bank Hapoalim has been unjustly enriched to the detriment of Sentry, its creditors and the current holders of Shares in Sentry.

47.      Furthermore, Bank Hapoalim was not entitled to receive the Redemption Payments because the amounts of the Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused the payment received by Bank Hapoalim for its redemption of Shares to be in excess of the actual Net Asset Value of such Shares.

48.      To the extent that Redemption Payments are not recovered by Sentry, the loss will be disproportionately and unjustly borne Sentry, its creditors and the current holders of shares in Sentry.

49.      It would offend principles of equity and good conscience to permit Bank Hapoalim to retain the Redemption Payments it received from Sentry.

50.      By reason of the foregoing, Sentry is entitled to recover from Bank Hapoalim a sum in an amount equal to the Redemption Payments.

## FOURTH CLAIM
### *(Money Had and Received-Against Beneficial Shareholders)*

51.     Sentry repeats and alleges again the allegations contained in paragraphs 1 through 50 above as if set forth herein.

52.     Upon information and belief, Bank Hapoalim may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreement in the capacity of trustee, agent, representative, or nominee for Beneficial Shareholders.

53.     Upon information and belief, Bank Hapoalim may have paid to or credited some or all of the Redemptions Payments received by it to accounts of Beneficial Shareholders.  As alleged above, any payments received by Beneficial Shareholder upon the redemption of Shares issued to Bank Hapoalim consisted of funds deposited with BLMIS by Sentry or by other investors and were not, as Sentry mistakenly believed, proceeds from the sale of securities held by BLMIS for the account of Sentry.

54.     To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to Bank Hapoalim in its capacity as trustee, agent, representative, or nominee for Beneficial Shareholders, such Beneficial Shareholders have been unjustly enriched to the detriment of Sentry, its creditors and the current holders of Shares in Sentry.

55.     Furthermore, Beneficial Shareholders were not entitled to receive any portion of the Redemption Payments paid to Bank Hapoalim upon the redemption of Shares issued to it in its capacity as trustee, agent, representative, or nominee for Beneficial Shareholders because the amounts transferred by Sentry with respect to Redemption Payments were based on a miscalculated and inflated Net Asset Value,

which caused the payment received for redemption of Shares to be in excess of the actual

Net Asset Value of such Shares.

56.     To the extent the Redemption Payments are not recovered by Sentry, the

loss will be disproportionately and unjustly borne solely by Sentry, its creditors and the

current holders of Shares in Sentry.

57.     It would offend principles of equity and good conscience to permit

Beneficial Shareholders to retain the Redemption Payments made by Sentry.

58.     By reason of the foregoing, Sentry is entitled to recover from Beneficial

Shareholders a sum equal to the portion of any Redemption Payments received by them

in respect of their interests in Shares of Sentry held for them through Bank Hapoalim.

## FIFTH CLAIM
### *(Mistaken Payment-Against Bank Hapoalim)*

59.     Sentry repeats and alleges again the allegations contained in paragraphs 1

through 58 above as if set forth herein.

60.     As described above, Sentry made each of the Redemption Payments to

Bank Hapoalim under the mistaken belief that the amounts paid to Bank Hapoalim

represented the proceeds of the sale of securities held for Sentry in accounts established

with BLMIS.

61.     Upon information and belief, however, BLMIS did not hold any securities

or interests of securities on account for Sentry and the payments made by BLMIS to

Sentry to fund Redemption Payments to Bank Hapoalim represented, in fact, funds

deposited with BLMIS by Sentry and other investors.

16

62.     The Redemption Payments, while benefiting Bank Hapoalim, were made to the detriment of Sentry, its creditors and the current holders of its Shares.

63.     Additionally, Bank Hapoalim was not entitled to receive the Redemption Payments because, as was unknown to Sentry, the amounts transferred by Sentry with respect to these Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused the payment received by Bank Hapoalim for its redemption of Shares to be in excess of the actual Net Asset Value of such Shares.   In these circumstances, the Redemption Payments should be returned for the benefit of Sentry, its creditors and the current holders of Shares in Sentry.

64.     To the extent the Redemption Payments are not recovered by Sentry, the loss will be disproportionately and unjustly borne solely by Sentry, its creditors and the current holders of shares in Sentry.

65.     It would thus offend principles of equity and good conscience to permit Bank Hapoalim to retain the Redemption Payments.

66.     By reason of the foregoing, Sentry is entitled to recover from Bank Hapoalim a sum in an amount equal to the Redemption Payments.

## SIXTH CLAIM
### *(Mistaken Payment-Against Beneficial Holders)*

67.     Sentry repeats and alleges again the allegations contained in paragraphs 1 through 66 above as if set forth herein.

68.     As described above, Sentry made each of the Redemption Payments to Bank Hapoalim under the mistaken belief that the amounts paid to Bank Hapoalim

represented the proceeds of the sale of securities held for Sentry in accounts established with BLMIS.

69.     However, upon information and belief, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to Bank Hapoalim represented, in fact, funds deposited with  BLMIS by Sentry and other investors.

70.     Upon information and belief, Bank Hapoalim may have paid to or credited some or all of the redemptions payments received by it to accounts of Beneficial Shareholders.  As alleged above, any payments received by Beneficial Shareholders upon the redemption of shares issued to Bank Hapoalim consisted of funds provided by funds deposited with BLMIS by Sentry and other investors and were not the proceeds of the sale of assets held by BLMIS for the account of Sentry.

71.     Additionally, Beneficial Shareholders were not entitled to receive any portion of the Redemption Payments received by Bank Hapoalim upon the redemption of Shares issued to it in its capacity as trustee, agent, representative, or nominee for Beneficial Shareholders because, as was unknown to Sentry, the amounts transferred by Sentry with respect to these Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused the Redemption Payments received by Bank Hapoalim for its redemption of Shares to be in excess of the actual Net Asset Value of such Shares.

72.     The Redemption Payments, while benefiting any Beneficial Shareholder receiving any portion thereof, were made to the detriment of the Sentry, its creditors and the current holders of its Shares.

73.     It would thus offend principles of equity and good conscience to permit any Beneficial Shareholder to retain the Redemption Payments.

74.     By reason of the foregoing, Sentry is entitled to recover from any Beneficial Shareholders a sum equal to the portion of any Redemption Payments received by them in respect of their interests in Shares of Sentry held for them through Bank Hapoalim.

## SEVENTH CLAIM
### *(Constructive Trust-Against all Defendants)*

75.     Sentry repeats and alleges again the allegations contained in paragraphs 1 through 74 above as if set forth herein.

76.     As described above, upon receipt of a redemption request, Sentry made redemption payment to Bank Hapoalim based on a miscalculated and inflated Net Asset Value, which caused Redemption Payments to be in excess of the actual Net Asset Value of redeemed Shares.

77.     As alleged above, the Redemption Payments represented deposits with BLMIS made by Sentry and other investors and were not, as Sentry mistakenly believed, proceeds from the sale of securities held by BLMIS for the account of Sentry.

78.     Upon information and belief, Bank Hapoalim may have paid some or all of the Redemptions Payments it received to Beneficial Shareholders,

79.     By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry, its creditors and the current holders of Shares in Sentry.

80.    Furthermore, Defendants were not entitled to receive the Redemption Payments because the amounts transferred by Sentry with respect to these Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused the payment received by Bank Hapoalim for its redemption of Shares to be in excess of the actual Net Asset Value of such Shares.

81.    It would offend principles of equity and good conscience to permit Defendants to retain the Redemption Payments.

82.    By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by Defendants for the benefit of Sentry, its creditors and the current holders of Shares in Sentry.

### **PRAYER FOR RELIEF**

WHEREFORE, Sentry requests  the following relief:

83.    On the First, Third and Fifth Claims, judgment for compensatory damages in favor of Sentry against Bank Hapoalim in an amount representing the Redemption Payments made to Bank Hapoalim, plus interest;

84.    On the Second, Fourth and Sixth Claims, judgment for compensatory damages in favor of Sentry against Beneficial Shareholders in an amount representing the amounts of Redemption Payments received by Beneficial Shareholders, plus interest;

85.    On the Seventh Claim, imposing a constructive trust on Redemption Payments; and

86.    Awarding Sentry the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses;

87.     Granting Sentry such other and further relief as the Court deems just and proper.

Dated: New York, New York
       August 16, 2010

                                    BROWN RUDNICK LLP

                                    By:  /s/ David J. Molton
                                        David J. Molton
                                        William R. Baldiga
                                        Daniel J. Saval
                                        May Orenstein
                                        Kerry Quinn

                                  Seven Times Square
                                  New York, New York 10036
                                  Telephone: 212.209.4822
                                  Facsimile: 212.209.4801

                                  *Attorneys for the Petitioners*