**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
Marek P. Krzyzowski
212-209-4800

-and-

**SELENDY & GAY PLLC**
1290 Avenue of the Americas
New York, NY 10104
David Elsberg
Caitlin Halligan
Andrew Dunlap
Lena Konanova
Ron Krock
212-390-9000

*Attorneys for the Foreign Representatives*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>**FAIRFIELD SENTRY LIMITED, et al.,**<br><br>    Debtors in Foreign Proceedings. | ) Chapter 15 Case<br>)<br>) Case No. 10-13164 (SMB)<br>)<br>) Jointly Administered<br>)<br>) |
| **FAIRFIELD SENTRY LIMITED (IN LIQUIDATION),** acting by and through the Foreign Representatives thereof, and **KENNETH KRYS** and **CHARLOTTE CAULFIELD,** solely in their capacities as Foreign Representatives and Liquidators thereof,<br><br>                    Plaintiffs,<br><br>            -against-<br><br>**BANK HAPOALIM (SUISSE) LTD.** a/k/a **BANQUE HAPOALIM (SUISSE) S.A.** and **BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE NAME OF BANK HAPOALIM (SUISSE) LTD. 1-1000,**<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>) Adv. Pro. No. 10-03510<br>) (SMB)<br>)<br>) **THIRD AMENDED**<br>) **COMPLAINT**<br>)<br>)<br>)<br>)<br>)<br>) |

Fairfield Sentry Limited ("Sentry"), by and through Kenneth Krys and Charlotte Caulfield (together with their predecessors, the "Foreign Representatives"), and Kenneth Krys and Charlotte Caulfield (together with Sentry, the "Plaintiffs"), solely in their capacities as the Liquidators of Sentry and the Foreign Representatives of the liquidation proceedings involving Sentry, Fairfield Sigma Limited ("Sigma"), and Fairfield Lambda Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the "Debtors") pending before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for their complaint against Defendants, allege the following based on personal knowledge or information derived from the Funds' books and records or from other sources, including, *inter alia*, court filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

1.      This action and similar actions are brought by the Plaintiffs, with the approval of the foreign court having jurisdiction over the matter, to recover payments made to shareholders for the redemption of shares in the Funds prior to December 2008.

2.      The Funds were created as a means for private investment in managed accounts with Bernard L. Madoff Investment Securities LLC ("BLMIS"), the brokerage business that Bernard L. Madoff used to perpetrate his massive Ponzi scheme.  Sentry was the largest of all so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency investments (respectively, Euro and Swiss Franc investments) through purchases of shares of Sentry.  Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of assets supposedly held by BLMIS for Sentry.  As stated in their offering materials, the Funds' investment objective was

to achieve capital appreciation of assets through investments in BLMIS (directly, in the case of Sentry; and indirectly, through Sentry, in the cases of Sigma and Lambda).

3.      It is now known that these types of feeder funds were essential to the perpetration of Madoff's Ponzi scheme.  In order for the Ponzi scheme to operate, Madoff required a continuous flow of new investors and investments to be able to satisfy redemption requests from early investors.  Feeder funds, such as Sentry (which was a direct feeder fund into BLMIS), and Sigma and Lambda (which were indirect feeder funds, through Sentry, into BLMIS), brought new investors into this scheme, allowing Madoff to make payments to early investors and thereby creating and perpetuating the illusion that BLMIS was engaged in a successful investment strategy and actively trading securities.

4.      From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all cash, net of fees and expenses, raised by the Funds through the sale of their shares was transferred (either directly in the case of Sentry or indirectly, through Sentry, in the cases of Sigma and Lambda) to BLMIS for investment in accounts managed by Madoff.  Prior to December 2008, the voting participating shares of Sentry ($.01 par value per share), Sigma (€.01 par value per share), and Lambda (CHF.01 par value per share) (the "Shares"), were redeemable for a price equal to the applicable Fund's "Net Asset Value."  Net Asset Value was to be determined, in accordance with applicable accounting standards, as the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each Fund, net of certain expenses ("Net Asset Value").

5.      From time to time, in order to make payments to investors for the redemption of Shares ("Redemption Payments"), Sentry generally made withdrawals from its BLMIS accounts. On occasion, Sentry made Redemption Payments directly from amounts on hand invested by

other subscribers in the Funds.  At all relevant times, the Funds believed payments that Sentry received from BLMIS represented the proceeds of sales of securities and/or investments held by BLMIS for Sentry.  The amount, per share, paid by the Funds to shareholders for each Share redeemed was to be equal to the per share Net Asset Value, which was calculated based principally on the assets that the Funds believed were being held, and investments that were being made, by BLMIS for Sentry's account.

6.      As the world now knows, Madoff was operating a massive Ponzi scheme through BLMIS.  Thus, at all relevant times, the money that Sentry transferred to BLMIS was not invested, but, rather, was used by Madoff to pay other BLMIS investors or was otherwise misappropriated by Madoff for unauthorized uses.  Further, none of the securities shown on statements provided to Sentry by BLMIS were in fact purchased for Sentry.  Additionally, none of the amounts withdrawn by Sentry from its accounts with BLMIS were proceeds of sales of securities or other investments.  Instead, such amounts represented the monies of more recent investors into the Madoff scheme.

7.      In light of the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, at all relevant times the assets purportedly held at BLMIS for Sentry were non-existent, and the Funds were insolvent at the time Redemption Payments were made or they were rendered insolvent by those payments.  As a result, at all relevant times, the Net Asset Value of the Shares redeemed was miscalculated, and Redemption Payments were mistakenly made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at any relevant time.

8.      At all relevant times, all payments made from BLMIS to Sentry and other feeder funds and investors were made by Madoff to perpetuate his Ponzi scheme and avoid detection of

4

his fraud.  Similarly, the Redemption Payments that the Funds made to redeeming shareholders were not made in the ordinary course of any business or for any legitimate purposes.  Those Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, as they were based upon Net Asset Values that were not calculated based upon the true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and simultaneously withdrawing monies from BLMIS), which the world now knows was operated by Madoff as a Ponzi scheme.  These payments were crucial in perpetuating the Ponzi scheme and maintaining the illusion that Madoff was making actual investments and employing a successful investment strategy.

9.      During the period from and after April 17, 2007, through November 19, 2008, following the receipt by Sentry of notices of redemption, Sentry made Redemption Payments to accounts held in the name of Defendant Bank Hapoalim (Suisse) Ltd. a/k/a Banque Hapoalim (Suisse) S.A. ("Bank Hapoalim") aggregating USD $19,940,228.68.

10.     At the time such payments were made, Sentry mistakenly believed that such payments were in the amount of the Net Asset Value of the Shares tendered at the time of redemption.  In fact, however, as stated, the Redemption Payments made to Bank Hapoalim far exceeded the Net Asset Value of Shares redeemed that would have been calculated based on the true facts existing at that time or any relevant time.  Moreover, these Redemption Payments did not, as Sentry intended, represent the proceeds arising from the profitability of or to continue investment in BLMIS.  Instead, any amounts obtained directly or indirectly by Sentry from

5

BLMIS to make Redemption Payments to Bank Hapoalim generally were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry investors invested in BLMIS.

11.     Accordingly, the Funds' actual assets are, and at relevant times were, far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against them, and, at all relevant times, the Funds were unable to pay their debts as they fell or would fall due.   Indeed, at the time the Redemptions Payments were made, the Funds had insufficient assets from which to pay debts as they fell or would fall due.

12.     In particular, claims had been previously asserted against the Funds in actions commenced by Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding pending before the United States Bankruptcy Court of the Southern District of New York, Picard v. Fairfield Sentry Limited, et al., No. 08-01789 (SMB) (the "BLMIS Adversary Proceeding").   As set forth in the complaint filed in the BLMIS Adversary Proceedings, the BLMIS Trustee sought to recover from the Funds, on preference and fraudulent transfer grounds, approximately $3.2 billion.   This amount was alleged to have been transferred to the Funds from BLMIS, directly (in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years preceding the December 2008 disclosure of the Madoff fraud. The BLMIS Trustee alleged that the monies transferred from BLMIS to the Funds were the misappropriated assets of other BLMIS investors.   At all relevant times, monies that the Funds received from BLMIS, net of fees and expenses, were transferred to shareholders as Redemption Payments.

13. On July 13, 2011, pursuant to an agreement between the Foreign Representatives and the BLMIS Trustee dated May 9, 2011, the United States Bankruptcy Court for the Southern District of New York entered judgments against each of the Funds on the claims against the Funds asserted in the BLMIS Adversary Proceeding (the "Judgments") in the amount of $3,054,000,000 with respect to Sentry, $752,300,000 with respect to Sigma, and $52,900,000 with respect to Lambda. The Redemption Payments rendered the Funds unable to satisfy their liabilities to the BLMIS customers, the BLMIS Trustee, including on account of the Judgments, and other creditors of the Funds, and further increased the amount of those liabilities. In this way, the Redemption Payments caused the Funds to become insolvent and/or deepened their existing insolvency, in that, among other things, at all relevant times the Funds were unable to pay their debts as they fell or would fall due.

14. Upon information and belief, Bank Hapoalim has either retained the Redemption Payments made to it by Sentry for its own account and benefit or, alternatively, paid all or some portion of such payments to or for the account of persons or entities for whom Bank Hapoalim may have subscribed for shares of the Funds in the capacity of trustee, agent, representative, nominee or custodian (individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders," together with Bank Hapoalim, the "Defendants").

15. Following the revelation of Madoff's fraud in December 2008, the Funds' boards of directors suspended any further redemptions of the Funds' shares and the calculation of each of the Funds' Net Asset Value. As of December 2008 and presently, Sentry, Sigma, and Lambda have, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

16. Unless Redemption Payments paid to shareholders are recovered for the Funds' estates, the Funds will be unable to satisfy their liabilities and claims that have been made or may

be made against them; further, recoveries of Redemption Payments will increase distributions to the Funds' investors who have been harmed.  Moreover, to the extent such liabilities and claims must be satisfied solely from the Funds' current assets, Defendants will have been unjustly enriched as they will not bear their proportionate share of such liabilities and claims, but rather will retain a windfall at the expense of other shareholders and creditors of the Funds.

## JURISDICTION AND VENUE

17.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as this adversary proceeding and the claims asserted by the Foreign Representatives herein arise under, arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, In re Fairfield Sentry Limited, et al., No. 10-13164 (SMB), pending in this Court.  Additionally, pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("SIPA"), which incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States Code, jurisdiction is also proper in this Court because this action also relates to the consolidated liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the caption Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC, SIPA Liquidation No. 08-1789 (SMB).  Pursuant to the Amended Standing Order of Reference of the United States District Court for the Southern District of New York, dated January 31, 2012, all proceedings arising in, arising under and/or related to cases under Title 11 of the United States Code (as amended, the "Bankruptcy Code") are referred to this Court for adjudication.

18.     This is a core proceeding under 28 U.S.C. § 157(b)(2).  Should the Court determine that this is a non-core proceeding, Plaintiffs consent to entry of final judgment and order by this Court.

19.    This Court has jurisdiction over Bank Hapoalim and any Beneficial Shareholders pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New York Civil Practice Law & Rules § 302 (McKinney 2008) because Bank Hapoalim and the Beneficial Shareholders purposely availed themselves of the laws of the United States and the State of New York by, among other things, investing money with the Funds, knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS, and maintaining bank accounts in the United States at JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank in New York, and in fact receiving Redemption Payments in those United States-based and/or New York-based accounts.    Bank Hapoalim and the Beneficial Shareholders selected U.S. dollars as the currency in which to invest and execute their transactions in Sentry, designated United States-based and/or New York-based bank accounts to receive their Redemption Payments from the Funds, and actively directed Redemption Payments at issue in this action into those bank accounts.    Bank Hapoalim and the Beneficial Shareholders thus knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York, derived significant revenue from New York, and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.    Bank Hapoalim and the Beneficial Shareholders should therefore reasonably expect to be subject to United States jurisdiction.

20.    Moreover, this Court has jurisdiction over Bank Hapoalim and any Beneficial Shareholders by virtue of the legally binding and valid agreements and representations set forth in one or more agreements for the subscription of Shares that Bank Hapoalim entered into with Sentry.

21.    Bank Hapoalim, upon information and belief, entered into a Subscription Agreement with Sentry on or about February 24, 2006 (the "Initial Subscription Agreement") pursuant to which Bank Hapoalim subscribed for Shares.  Subsequent to entering into the Initial Subscription Agreement, Bank Hapoalim, upon information and belief, entered into additional agreements (the "Subsequent Subscription Agreements") with Sentry on or about February 26, 2007, March 28, 2007, April 25, 2007, May 29, 2007, June 27, 2007, July 27, 2007, August 29, 2007, September 26, 2007, October 29, 2007, November 28, 2007, December 27, 2007, January 29, 2008, February 26, 2008, February 27, 2008, March 27, 2008, and May 2, 2008, pursuant to which it subscribed for additional Shares on the same terms and conditions as those Shares subscribed for pursuant to the Initial Subscription Agreement.  The Initial Subscription Agreement and Subsequent Subscription Agreements are collectively referred to herein as the "Subscription Agreements."

22.    The Subscription Agreements provide for, *inter alia*, the irrevocable submission by Bank Hapoalim to the jurisdiction of the New York courts with respect to any proceeding with respect to said agreement and Sentry and Bank Hapoalim's consent to service of process by the mailing of such process, as provided therein.  In particular, the Subscription Agreements provide as follows:

> New York Courts.    Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York.  Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum. Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then appearing on the Fund's records.  Nothing herein shall affect the Fund's right to commence any Proceeding or otherwise to proceed against Subscriber in any

other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

23.      Furthermore, by executing the Subscription Agreements, Bank Hapoalim agreed to all terms and conditions contained therein, including the express provision that any agreement made by Bank Hapoalim in the Subscription Agreements would also apply to any other person for whom Bank Hapoalim was subscribing as trustee, agent, representative, or nominee – i.e., all Beneficial Shareholders.  Moreover, by executing the Subscription Agreements, Bank Hapoalim represented that it had all requisite authority from Beneficial Shareholders to execute and perform any and all obligations on their behalf, and also agreed to indemnify Sentry for any damages resulting from an assertion by a Beneficial Shareholder that Bank Hapoalim lacked proper authorization to enter into the Subscription Agreements or perform the obligations thereof.  Specifically, the Subscription Agreements provide as follows:

> If Subscriber is acting as a Representative.  If Subscriber is subscribing as trustee, agent, representative, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder. Subscriber has all requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder.  Subscriber also agrees to indemnify the Fund . . . for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained here, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Agreement or perform the obligations hereof.

24.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

### Plaintiffs

25.      Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sentry's

registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI. Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the BVI Court.

26.     The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and on behalf of the Funds or in their own official names.  On April 23, 2009, the BVI Court issued an order appointing Christopher Stride as liquidator of Lambda (the "Lambda Appointment Order").   On July 21, 2009, the BVI Court issued an order appointing Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry & Sigma Appointment Order").   On September 6, 2010, the BVI Court issued notices acknowledging Mr. Stride's resignation and the appointment of Joanna Lau as joint liquidator with Mr. Krys of all three Funds (the "Supplemental Appointment Order").  On November 23, 2011, Ms. Lau resigned as joint liquidator of the Funds.  On June 24, 2014, the BVI Court issued an order appointing Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three Funds (the "Second Supplemental Appointment Order" and, together with the Lambda Appointment Order, the Sentry & Sigma Appointment Order, and the Supplemental Appointment Order, the "BVI Appointment Orders").   The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of the Funds, have been authorized by the foreign court having jurisdiction over the matter to bring this action and the claims herein, including the avoidance claims herein under the BVI Insolvency Act of 2003 (the "BVI Insolvency Act").

27.     Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' businesses, including, among other things, custody and control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of

12

the Funds, any deeds, receipts or other documents, and the power to compromise claims, commence litigation and to dispose of property.    After obtaining BVI Court approval, the Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title 11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15.  On July 22, 2010, this Court issued an order (the "Recognition Order") granting that recognition.

28.    Pursuant to the Recognition Order, the Foreign Representatives were automatically afforded relief available under 11 U.S.C. § 1520, including application of the Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as well as the ability to operate the Funds' business and exercise the rights and powers of a trustee under Sections 363 and 552 of the Bankruptcy Code.   Moreover, the Bankruptcy Court specifically granted additional relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a).   Such relief includes, but is not limited to: (i) staying any actions, proceedings or execution against the Funds' assets to the extent not stayed under Section 1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and realization of the Funds' assets that are located within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the proceedings before the BVI Court.

**Defendants**

29.    Bank Hapoalim was, at all relevant times, a member of Sentry and a registered holder of Shares.  Upon information and belief, Bank Hapoalim is a corporate entity organized under the laws of Luxembourg and having its registered address at 18 Boulevard Royal, 2449

Luxembourg.  Bank Hapoalim subscribed for the purchase of Shares by entering into one or more Subscription Agreements with Sentry.  All purchases of Shares by Bank Hapoalim were subject to the terms of the Subscription Agreements.

30.    Defendants "Beneficial Owners of the Accounts Held in the Name of Bank Hapoalim (Suisse) Ltd." - i.e., the Beneficial Shareholders, are, as noted, any persons or entities having a beneficial ownership or interests in Shares of Sentry issued to Bank Hapoalim and on whose behalf Bank Hapoalim was acting as trustee, agent, representative, or nominee.

## NOTICE PURSUANT TO FED. R. CIV. P. 44.1

31.    Certain of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands.  Plaintiffs intend to rely upon the applicable laws of that territory.

## FACTUAL ALLEGATIONS

### A.  Role of Feeder Funds In Madoff Fraud

32.    Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry. Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS.  As stated in its offering materials, Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

33.    As discussed above, Sentry, Sigma, and Lambda were established for the purpose of making investments in BLMIS.  It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme.  The feeder funds brought new investors and new

investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments, and in this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

**B.  Calculation of Net Asset Value and Shareholder Redemption Payments**

34.     Substantially all of the money (up to 95%) raised by the Funds from the sale of their Shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy.   In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for each Share tendered for redemption, an amount that was based on each of the respective Funds' purported Net Asset Value, as it was then calculated.

35.     In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry.   Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in addition to, among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other documents to calculate the Net Asset Value of the Shares.

36.     In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements.    None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred.   Indeed, no investments of any kind were ever made by BLMIS for Sentry.   At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious.   Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase of securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

37.     From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized subscription monies of other investors on hand that were directed for investment in BLMIS). The Funds believed that the amounts provided in connection with such withdrawals represented the proceeds arising from the profitability of or to continue investment in BLMIS.   In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud.   At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of his fraud.   The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose.   Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business.

38.     Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme.   At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.

C. **Redemption Payments Made or Transferred to Defendants**

39.     During the period from and after April 17, 2007, through November 19, 2008, Bank Hapoalim received Redemption Payments totaling USD $19,940,228.68 from Sentry in respect of Shares tendered for redemption.

40.     At Bank Hapoalim's directions and instructions, Bank Hapoalim received all of its Redemption Payments at its bank account with JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank in New York.

41.     The dates and amounts of each Redemption Payment received by Bank Hapoalim from Sentry, and the Bank Hapoalim bank accounts to which each Redemption Payment was made, are set forth on Exhibit A.

42.     At the time those Redemption Payments were made, the Funds had insufficient assets and were unable to pay their debts as they would fall due.   In exchange for each Redemption Payment, each of which constitutes or forms part of a transaction between Bank Hapoalim and Sentry, Sentry received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry.

17

43.    Upon information and belief, Bank Hapoalim and/or the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their Shares.

**D.  Citco Did Not Issue Any Certifications of Net Asset Value in "Good Faith"**

44.    Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net Asset Value per Share . . . given in good faith by or on behalf of the Directors shall be binding on all parties."  During the relevant period, statements of the Net Asset Value were issued by the Funds' administrators, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (the "Administrators").  On April 16, 2014, the Judicial Committee of the Privy Council (the "Privy Council") issued a decision in which it held that certain statements of Net Asset Value, in particular, certain monthly emails, contract notes, and monthly account statements issued by the Administrators, constituted "certificates" for the purposes of Article 11 (the "Certificates").   The Privy Council did not, however, address whether such Certificates were given "in good faith."  In carrying out this responsibility, the Administrators and affiliated Citco companies within Citco Group Limited (collectively, "Citco") acted with a lack of good faith in giving the Certificates.

45.    Over the course of fifteen years, in its capacity as service providers to the Funds, Citco reviewed information concerning BLMIS not available to the general public, and expressed internal alarm about what that information showed with respect to the likelihood of fraud at BLMIS, but turned a blind eye to the reality reflected in the information and instead proceed with issuing the Certificates as if there were no problem.

46.    So grave were the Administrators' internal concerns that they expressed doubts— many years before the fraud was made public—that the Funds' assets with BLMIS even existed, with one employee stating "I will not change my [opinion] as long as I [do] not see evidence that

the portfolio exists."  The Administrators also expressed repeated concern over the fact there was

no segregation of duties at BLMIS—*i.e.*, BLMIS (i) had discretion over which investments to

make and when to make them, such that BLMIS was de facto investment manager, (ii) had actual

custody of the Funds' assets, such that BLMIS was de facto custodian, and (iii) was also the

broker.  Based upon the proprietary information they reviewed, Citco expressed concern—

internally—that BLMIS would be a repeat of the notorious Manhattan Investment Fund fraud of

the 1990s "multiplied by a factor of five."  Ultimately, unable to resolve their grave concerns,

Citco, rather than withdrawing, ceasing to issue Certificates, or sounding a public alarm, made a

corporate decision to continue on as service providers—in exchange for an 800% increase in

fees.

### 1.    Citco Expressed Doubt as to Whether the Funds' Assets at BLMIS Even Existed.

47.    Beginning in 2000, the Administrators ran into trouble with the basic task of

verifying the existence of the Funds' assets with Madoff.  Initially, Citco expressed serious

concerns regarding whether the Funds' Treasury bond transactions actually matched those

transactions reported by Madoff because of an apparent "rhythm of trading" each month.  The

rhythm of trading within Sentry's portfolio appeared too consistent to be true, as the assets

included only a limited number of Treasury bonds by each month's end.  At the beginning of

each month, Madoff would purchase shares and put options and would sell call options, but, like

clockwork, would then liquidate all of Sentry's holdings by the 20th of each month.  Thus the

Administrators wanted to check whether the Treasury bonds even existed at all.

48.    The Administrators could not verify the existence of the assets because the Funds'

custodians, Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody (the

"Custodians"), did not actually hold them.  Instead, Madoff served as his own custodian.

19

Therefore, the custody statements that the Custodians were supposed to generate based on assets in their possession, were instead merely copied, or "shadow booked," from BLMIS account statements. The Custodians were "only the custodian[s] on paper, not in reality" and did not place any trades for the Funds.

49.    Management within Citco, including Ruud Bodewes ("Bodewes"), the head of internal audit for all of Citco Group, and Ger Jan Meijer ("Meijer"), the head of internal audit for the Administrators, expressed concern about the operations at BLMIS. In May 2000, Bodewes expressed his concern to the general counsel and manager of Citco Bank Nederland, as well as Meijer, that "[w]ith [the] Manhattan [Investment Fund fraud] in the back of our minds, we, as Citco, may very well be in a potential dangerous situation, since we do not seem to have an independent source to verify the information from BLMIS." Indeed, Meijer had raised these concerns to Bodewes weeks earlier, warning that Madoff could be "a Manhattan multiplied by a factor of five."

50.    In addition to warning Bodewes, Meijer also warned Citco Group's Chief Executive Officer, Christopher Smeets ("Smeets") in May 2000 that "[t]o not react or to react too late does indeed mean that investors once again faithfully deposit tens of millions of USD in the Madoff well (for which we do not know if there is a bottom to it) at month's end," with the understanding that Citco could "already be held personally responsible insofar as we have allowed the subscriptions to take place as of May without a fight." Smeets acknowledged receipt of Meijer's emails and concerns. At that time, Meijer emphasized that "with the current knowledge and Citco as asset protector, Citco has a legal obligation to obtain more assurance" of the Funds' assets.

51.    However, in what became a familiar pattern, Citco turned a blind eye to the documents and information in their possession.  Citco Group did not address the Administrators' concerns raised in May 2000, and a few months later, Meijer stated:  "[i]t seemed that this affair [was] being put on the back burner and hushed."

52.    A year later, Meijer again reiterated his concerns about BLMIS's operations, which "remain[ed] unsolved."  Meijer warned that "Citco has a risk exposure of more than USD3 billion" and that "[p]robably there are no options to restore this situation from a worst case scenario."  He stated: "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists."  Five months later, in January 2002, the Administrators again emphasized that the issues concerning BLMIS posed severe risks to Citco and the Funds' investors.  Meijer told Bodewes: "I have been worried about this situation for 2 years (including the risk to the continued existence of Citco), however the same was not taken seriously by certain gentlemen. . . . My intuition (combined with the business that I have seen) tells me that things are not right."

53.    In January 2002, Meijer insisted to Bodewes that: "Citco must now seriously take the possibility that everything is really wrong with [the Funds'] account, as well as the possibility that everything will come into view within 2 years. . . . Personally I think the chance [that something is wrong] is at least 50%."  Meijer persisted that there was "still the opportunity to more or less direct the whole process, and search out the best way out with the help of good lawyers (legal contingency plan).  Otherwise you run the risk that the scene will later be determined by others."  However, in response Citco Group's management, and Bodewes in particular, failed to undertake a meaningful investigation into Meijer's doubts regarding the existence of the Funds' assets, and instead continued acting as a service provider for the Funds for over six more years.

21

54.     In fact, multiple members of the Administrator's management tried to prevent Meijer from asking questions.   John Verhooren ("Verhooren"), a member of Citco's administration services management team, actually knew that Meijer had raised concerns about the existence of the Funds' assets for years, but deliberately ignored those concerns.   For example, in May 2000, Verhooren acknowledged that the lack of segregation of duties and trading patterns at Madoff were not new discoveries, and many people at Citco had already recognized these phenomena.   Later, in response to concerns raised in 2001, Verhooren again rebuffed Meijer's insistence that Citco was facing "an enormous risk exposure."   Instead, Verhooren told Meijer to stop raising the issue and claimed that Citco would try to meet with Madoff to investigate.   However, neither Verhooren nor any member of the Administrator's staff ever gained sufficient evidence that the Funds' assets existed from Madoff.

**2.      Citco Failed To Obtain Evidence Of the Existence of the Funds' Assets.**

55.     Citco not only expressed internal concern regarding whether the Funds' assets with BLMIS even existed—it knew that BLMIS would not confirm their existence for Citco as the Funds' service providers.

56.     The Administrators' audit reports designated Sentry as a non-compliant fund on their "watch list" as a result of the lack of segregation of duties at BLMIS.   Each year from 2000 through 2006, the Administrators recommended that Citco either confirm the existence of the Funds' assets held by BLMIS or resign as service providers.   On three occasions between May 2000 and December 2002, Citco attempted to verify the existence of the Funds' assets at BLMIS. All attempts failed.

57.     In May 2000, Citco set up a meeting with Madoff to gain "independent confirmation of the[] existence" of the Funds' assets, particularly the Treasury bills, and to

determine how Madoff derived share prices from the markets.  However, this effort failed.
BLMIS did not verify the existence of the assets, and Citco concluded internally that the meeting
had not provided "a full disclosure of [the] assignment."

58.     In July 2001, Bodewes had attempted to assess the concerns raised by Meijer in
an internal due diligence memorandum.  However, Bodewes's due diligence was limited to a
review of Citco's proprietary documents because Citco was concerned that permitting "an on-site
audit at [BLMIS] premises may hurt the relationship with [the Fund], resulting in a possible loss
of [a] USD 1.5 million dollar fee income."  Even so, based on the documents and information in
Citco's possession, Bodewes shared Meijer's concerns about BLMIS's operations, and
concluded that losses at BLMIS could be hidden, leaving Citco ultimately liable to the Funds'
shareholders.  Bodewes also noted that the two man audit firm used by BLMIS did not "match
up" with the size of BLMIS's business.   Indeed, multiple Administrator employees
acknowledged that the small size of Madoff's accounting firm posed a risk, given that the size of
the firm was not large enough to audit the amount of assets purportedly managed by BLMIS.

59.     Smeets, Citco Group's CEO, received Bodewes' memo regarding the issues at
BLMIS, including the issues posed by the size of Madoff's audit firm.   Citco Group's
management responded that they would like to "work this out" with Madoff, but never met with
him in 2001.  By an email dated 6 February 2002, Unternaehrer of Citco Group stated that Citco
wanted evidence the T Bills existed.  In December 2002, Citco once again "attempt[ed] to get
conclusive proof" from Madoff that Sentry's portfolio was in BLMIS custody and to have
"Madoff . . . provide evidence of the existence/custody of the positions."  Before the meeting,
Meijer directed a member of the internal audit group at Citco to "[p]roperly record what you
have done and what you have not been able to determine. . . . It is a troublesome task insofar as

Madoff is not known for his openness." However, the meeting did not include any meaningful discussion with Madoff regarding the holdings purported to be in his custody. The employee, Albert van Nijen, reported back that the Administrators' "mission" to increase "Citco's comfort level with respect to the existence of the assets in relation to [Citco's] responsibilities as Custodian[s]" had again failed. On 27 December 2002 Bodewes reported to the executive committee of Citco Group that as long as the position of Sentry with BLMIS was not independently verified "there will be doubts".

60.     After Citco's third failed attempt, Citco never again tried to gain evidence from Madoff that the Funds' assets existed until his fraud was ultimately exposed in December 2008. In addition, Meijer noted that "Madoff [was] no[t] known" to Citco's external traders, even though his investment strategy required selling major quantities of call options each month. In an email to Bodewes, Meijer stated, "I visited the Madoff website. . . . According to the investment policy, the fund needs to sell major quantities of call options on the market each month. I absolutely do not trust it!!!!"

61.     Meanwhile, through the entire period, Citco continued to issue the Certificates.

**3.     Citco Negotiated For Higher Fees As Reimbursement For the "Risks" of Doing Business with Madoff.**

62.     Facing grave concerns regarding the Funds' assets placed with BLMIS, Citco put its financial interests ahead of its duties to the Funds and the Funds' investors.

63.     By 2002, Citco knew that the Funds' holdings could not be verified, knew that BLMIS cleared its own trades, and knew that Citco's efforts to reconcile Madoff's operations had failed. That year, Citco's executive committee put credit line requests from the Funds "on hold until . . . the 'investigation' on Fairfield" was complete, because Citco was concerned about its exposure to liabilities well beyond the loans in the case of fraud. Smeets and Citco's

management were aware that the credit line requests were on hold while Citco tried to "get as much comfort as possible" that BLMIS was not a fraud.

64.    Two years later, in February and March 2004, the Custodian decided to cancel one of its credit facilities with Sentry following its discovery that AIG had pulled its investments from BLMIS altogether.    Specifically, the Administrator's management, including Meijer, Verhooren, and William Keunen—who was responsible for the entire division of administration services at Citco—found out that "the risk team of AIG took the decision to get out from all Madoff exposure . . . [t]hey are scared with the structure . . . ."    It appears that at least some Citco Group management wanted the Custodian to resign: by an email of 6 February 2004, Keunen informed the Administrator that Unternaehrer of Citco Group had decided the Custodian should step down as custodian.    At this time, Smeets was kept informed and aware of Citco's concerns regarding AIG's withdrawal from Madoff.    A few months later, in or about September 2004, Citco's board of directors made the decision to place the Custodians' and Administrators' business with the Funds "under scrutiny" and "to close down all credit relationships . . . to decrease [Citco's] exposure."    Citco knew that its credit relationship with the Funds would expose it to liability because of BLMIS's role as custodian, among other reasons.

65.    By 2006, Citco considered resigning as service providers.    The Custodians told Citco Group's management, including Smeets: "We are taking a risk and we only get US$60K per year!"

66.    Instead, Citco negotiated a new fee arrangement. The new arrangement calculated the Custodians' rate as one basis point (one hundredth of one percent) of the Funds' total Net Asset Value.    In other words, Citco's fees for the Custodians' services were now directly tied to the Net Asset Value as determined by the Administrators.    Citco decided "[o]n that basis" to stay

on as Custodians because Sentry's Net Asset Value at that time, based principally on the assets purportedly at BLMIS, was approximately "$5bn, i.e., fees of $500k."

67.    Simply put, Citco accepted dramatically higher fees—tied directly to the Net Asset Value certified by Citco—in exchange for the risks to Citco of doing business with BLMIS, as well as its continued silence regarding BLMIS's role as custodian of the Funds' assets.  Ultimately, Citco's fees increased by 800%.

68.    Internally, Citco knew that: (i) the Administrators did not consistently price the Funds' portfolios independently and typically relied exclusively on the share pricing information supplied by Madoff; and (ii) the Custodians did not have custody of the Funds' portfolios.

69.    Citco failed to verify the pricing information for the Funds' portfolio from independent sources and instead relied on BLMIS statements, even though it knew that such account statements contained incorrect information.  Accountants working for the Administrators discovered on numerous occasions that the trades reported by BLMIS contradicted the public daily price ranges for corresponding trades.  When the Administrators' personnel discovered that the reported share or option prices reported by Bloomberg and Madoff differed, they used the public price in calculating the Net Asset Value reflected in the Certificates.  Citco thus turned a blind eye to its knowledge that BLMIS issued account statements with incorrect pricing information.

70.    Citco acted with a lack of good faith by issuing Certificates in spite of its knowledge that: (1) BLMIS's transactions were likely impossible, given its awareness that "Madoff always [knew] precisely when to buy and sell;" (2) Madoff was the only broker-dealer Citco worked with that provided settlement date transaction confirmations only, rather than trade date confirmations; and (3) Madoff insisted that Citco book all trades for the Funds manually,

rather than through automated or electronic means, which directly contradicted Citco's own "policy to set up [electronic] reconciliation programs for each fund and to avoid manual entries as much as possible;" and, within its own records, "there [were] differences between the custody statements of Citco Bank and Madoff that [were] not being analyzed" by Citco.

71.     This lack of good faith permeated the entire Citco organization.  Until 2008, the Administrators and the Custodians worked hand-in-hand with multiple other "Citco" entities to generate the Certificates for the Funds and served as the intermediaries for all subscription funds invested by Defendants under the Subscription Agreements.  Under Citco Group's direction and control, the Administrators issued Certificates without good faith and with willful blindness to the fact that they could not confirm whether the Funds' assets actually existed.

72.     From the top down, Citco saw and appreciated, but consciously disregarded, the risks to the Fund's investors posed by Madoff's operations.  The Administrators and all other "Citco" subsidiaries served at the whim of Citco Group, which controlled the day-to-day operations of the Administrators and the issuance of Certificates showing an inaccurate and inflated Net Asset Value under the Administration Agreements (as amended from time to time) with the Funds.  Irrespective of which "Citco" entity the Funds' engaged, at all relevant times the Funds' were provided services from and on behalf of "Citco" as a whole from at least eight separate entities, including: Citco Group; Citco Global Custody NV; Citco Global Custody (NA) NV; CGC (NA); Citco Fund Services (BVI); Citco Fund Services (Europe) B.V.; Citco (Canada) Inc.; and Citco Global Security Services.

73.     By virtue of the foregoing conduct, Citco issued the Certificates without good faith.  The Funds were the primary victims of Citco's conduct and its lack of good faith in issuing the Certificates.

27

## E.  **Exposure of Madoff's Fraud**

74.     On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multi-billion dollar Ponzi scheme.  See United States v. Madoff, No. 08-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

75.     On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS.  See SEC v. Madoff, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

76.     In March 2009, Madoff pleaded guilty to the criminal charges brought against him.  In his plea allocution, Madoff confessed: "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L. Madoff Securities LLC."  As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options and other securities of large well-known corporations, and upon request, would return to them their profits and principal.  Those representations were false because for many years up and until I was arrested on December 11, 2008, I never invested those funds in the securities, as I had promised.  Instead, those funds were deposited in a bank account at Chase Manhattan Bank.  When clients wished to receive the profits they believed they had earned with me or to redeem their

principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.

77.     Madoff further confessed to covering up his fraud by fabricating false trade confirmation and account statements:

> To further cover-up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me. The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations.

78.     Madoff is now serving a 150-year sentence in federal prison.

**F.  The Funds' Estates in Liquidation**

79.     Following the revelation of Madoff's fraud, the Funds' boards of directors suspended any further redemptions of Shares and the calculation of the Funds' Net Asset Values. As of December 2008 and presently, Sentry, Sigma, and Lambda had, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

80.     In 2009, the Funds were put into liquidation proceedings in the BVI.

81.     On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act seeking the appointment of a liquidator over Lambda (the "Lambda Proceeding").  The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

82.     On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding").  The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

83.    On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings").   The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

84.    As alleged above, the BVI Court issued orders – the BVI Appointment Orders – appointing the Foreign Representatives as liquidators of the Funds.   Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

85.    The Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of Sentry's estate that Defendants are not entitled to keep.

### FIRST CLAIM
#### (Unfair Preference Pursuant to Section 245 of the BVI
#### Insolvency Act - Against Bank Hapoalim)

86. The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 85 above as if set forth herein.

87. Section 245 of the BVI Insolvency Act provides:

(1) Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction (a) is an insolvency transaction; (b) is entered into within the vulnerability period; and (c) has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if the transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the ordinary course of business;

(3) A transaction may be an unfair preference notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a transaction entered into the by the company within the vulnerability period has the effect specific in subsection 1(c) in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the transaction was an insolvency transaction and that it did not take place in the ordinary course of business.

88. A creditor is defined in Section 9 of the BVI Insolvency Act as follows:

(1) A person is a creditor of another person (the debtor) if he has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in (a) the liquidation of the debtor, in the case of a debtor that is a company or a foreign company; or (b) the bankruptcy of the debtor, in the case of a debtor who is an individual.

89.    The BVI Insolvency Act further defines an "insolvency transaction" as a transaction that: "(a) is entered into at a time when the company is insolvent; or (b) . . . causes the company to become insolvent."  BVI Insolvency Act § 244(2).

90. For the purposes of assessing unfair preferences under Section 245 of the BVI Insolvency Act and undervalue transactions under Section 246 of the BVI Insolvency Act, a company is "insolvent" if: "(c) . . . (ii) the company is unable to pay its debts as they fall due." BVI Insolvency Act §§ 8, 244(3).

91. For purposes of Section 245 and Section 246 of the BVI Insolvency Act, "vulnerability period" means "in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing two years prior to the onset of insolvency and ending on the appointment of the administrator or, if the company is in liquidation, the liquidator . . . ."  BVI Insolvency Act § 244(1).

92. The "onset of insolvency" is defined as: "the date on which the application for the appointment of the liquidator was filed."  BVI Insolvency Act § 244(1).  Thus, the vulnerability period, for each of the Funds, is the period commencing two years prior to the application for the appointment of the Liquidators for each Fund and ending on the date of the appointment of the liquidators of each Fund.

31

93. A "connected person" is:

(1) . . . one or more of the following:

(a) a promoter of the company;

(b) a director or *member of the company* or of a related company;

(c) a beneficiary under a trust of which the company is or has been a trustee;

(d) a related company;

(e) another company one of whose directors is also a director of the company;

(f) a nominee, relative, spouse or relative of a spouse of a person referred to in paragraphs (a) to (c);

(g) a person in partnership with a person referred to in paragraphs (a) to (c); and

(h) a trustee of a trust having as a beneficiary a person who is, apart from this paragraph, a connected person.

BVI Insolvency Act § 5 (emphasis added).

94. Redemption Payments aggregating USD $19,940,228.68 were made by Sentry to Bank Hapoalim during the two-year period prior to the application for appointment of the Liquidators of Sentry in the BVI Liquidation Proceedings (the "Sentry Vulnerability Period").

95. During the Sentry Vulnerability Period, Sentry was insolvent or was rendered insolvent by the making of Redemption Payments.

96. Each of the Redemptions and/or Redemption Payments made during the Sentry Vulnerability Period ("Vulnerability Period Payments") was an "insolvency transaction" within the meaning of Section 245 of the BVI Insolvency Act.

97. Bank Hapoalim was a shareholder (i.e., a member) of Sentry during the Sentry Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

98. Each of the Vulnerability Period Payments put Bank Hapoalim in a better position than it would have been in had such Payment not been made.

99. Because Bank Hapoalim was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions." Further, even were this not presumed, the Redemptions and/or Vulnerability Period Payments were "insolvency transactions" because at all material times the Funds were insolvent. This is because the Funds' assets were up to 95% invested with BLMIS and were only able to pay debts falling due either (i) with payments (including fictitious profits) from the Ponzi scheme BLMIS, i.e. using the proceeds of fraud, or (ii) by using incoming subscription monies (as a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers). Each time the Funds withdrew monies from BLMIS an equivalent liability immediately arose to the creditors of and investors in BLMIS. On any commercial basis the Funds were insolvent on a cash flow basis at all material times.

100. In addition, there is a statutory presumption that the Vulnerability Period Payments were "not made in the ordinary course of any business" of Sentry. Even were this not presumed, the same would follow in that, among other things, each Vulnerability Period Payment represented a distribution of monies (including fictitious profits) from Madoff's Ponzi scheme or incoming subscription monies (which merely represented a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers), and it was no part of the ordinary course of business of the Funds to invest in and distribute profits of a Ponzi scheme.

101. Each of the Vulnerability Period Payments was made following receipt by Sentry of a notice of redemption in respect of Shares, which triggered the redemption process under the Articles. Following the receipt by Sentry of a notice of redemption by Bank Hapoalim, Bank

Hapoalim became a contingent creditor. Upon the subsequent redemption of Bank Hapoalim's shares and until such time as Bank Hapoalim received the Vulnerability Period Payment, Bank Hapoalim was a "creditor" of Sentry with an admissible claim against Sentry in any subsequent liquidation of Sentry had payment of the Redemption Price not been made, albeit that post-liquidation Bank Hapoalim would have been deferred to outside creditors.

102.    By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and entitling the Foreign Representatives to recover from Bank Hapoalim an amount equal to the Vulnerability Period Payments received by Bank Hapoalim from Sentry.

## SECOND CLAIM
### (Unfair Preference Pursuant to Section 245 of the BVI Insolvency Act - Against Beneficial Shareholders)

103.    The Foreign Representatives, in their capacities as Foreign Liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 102 above as if set forth herein.

104.    Upon information and belief, Bank Hapoalim may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

105.    Upon information and belief, Bank Hapoalim may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.

106.    To the extent that any money that Bank Hapoalim received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are

34

entitled to avoid and set aside such further transfer by Bank Hapoalim to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

### THIRD CLAIM
*(Undervalue Transaction Pursuant to Section 246 of the*
*BVI Insolvency Act - Against Bank Hapoalim)*

107.    The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 106 above as if set forth herein.

108.    Section 246 of the BVI Insolvency Act provides that;

(1) Subject to subsection (2), a company enters into an undervalue transaction with a person if (a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or (b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company; and (c) in either case, the transaction concerned (i) is an insolvency transaction; and (ii) is entered into within the vulnerability period.

(2) A company does not enter into an undervalue transaction with a person if (a) the company enters into the transaction in good faith and for the purposes of its business; and (b) at the time when it enters into the transaction, there were reasonable grounds for believing that the transaction would benefit the company.

(3) A transaction may be an undervalue transaction notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a company enters into a transaction with a connected person within the vulnerability period and the transaction falls within subsection (1)(a) or subsection (1)(b), unless the contrary is proved, it is presumed that (a) the transaction was an insolvency transaction; and (b) subsection (2) did not apply to the transaction.

109.    During the Sentry Vulnerability Period, all assets purportedly held by BLMIS for

Sentry and other investors were non-existent, and Sentry was insolvent or was rendered insolvent

by the Vulnerability Period Payments, as alleged in paragraph 99 above.  Thus, each of the

Redemptions and/or Vulnerability Period Payments qualifies as an "insolvency transaction"

within the meaning of Section 244 of the BVI Insolvency Act and for purposes of Section 246 of

the BVI Insolvency Act.

110.    Sentry received no consideration for any of the Vulnerability Period Payments, or

in the alternative, Sentry received, for each Vulnerability Period Payment, consideration, the

value of which, in money or money's worth, was significantly less than the value, in money or

money's worth, of the consideration provided by Sentry to Bank Hapoalim for each of the

Vulnerability Period Payments.

111.    Bank Hapoalim was a shareholder (i.e., a member) of Sentry during the

Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI

Insolvency Act.

112.    Because Bank Hapoalim was a "connected person" as defined in the BVI

Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability

Period Payments were "insolvency transactions."  Further, there is a statutory presumption that

the Vulnerability Period Payments were not made in good faith and for the purposes of the

Funds' business with reasonable grounds to believe that they would benefit the Funds.  Even

were that not presumed, it is in any event clear that the purpose of the Funds was not to invest in

and distribute fictitious profits from a Ponzi scheme such as BLMIS.

113.    By reason of the foregoing, the Foreign Representatives, in their capacities as

Foreign Representatives and liquidators of Sentry, are entitled to an order avoiding and setting

36

aside the Vulnerability Period Payments and to recover from Bank Hapoalim an amount equal to the Vulnerability Period Payments received by Bank Hapoalim from Sentry.

### FOURTH CLAIM
***(Undervalue Transaction Pursuant to Section 246 of the***
***BVI Insolvency Act - Against Beneficial Shareholders)***

114.    The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 113 above as if set forth herein.

115.    Upon information and belief, Bank Hapoalim may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

116.    Upon information and belief, Bank Hapoalim may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.

117.    To the extent that any money that Bank Hapoalim received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, are entitled to avoid and set aside such further transfer by Bank Hapoalim to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.    On the First and Second Claims:

      i.       a declaratory judgment in favor of the Foreign Representatives and against Bank Hapoalim and the Beneficial Holders that the Redemptions and/or Vulnerability Period Payments constitute Unfair Preferences under Section 245 of the BVI Insolvency Act;

      ii.     judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

      iii.    judgment pursuant to Section 249 of the BVI Insolvency Act against Bank Hapoalim and the Beneficial Holders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest;

B.       On the Third and Fourth Claims:

      i.       a declaratory judgment in favor of the Foreign Representatives and against Bank Hapoalim and the Beneficial Holders that the Redemptions and/or Vulnerability Period Payments constitute Undervalue Transactions under Section 246 of the BVI Insolvency Act;

      ii.     judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or  Vulnerability Period Payments; and

      iii.    judgment pursuant to Section 249 of the BVI Insolvency Act against Bank Hapoalim and the Beneficial Holders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest;

C.       Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

D.       Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
      August 8, 2019

                 **BROWN RUDNICK LLP**

                 By: */s/ David J. Molton*
                 David J. Molton
                 Marek P. Krzyzowski
                 Seven Times Square
                 New York, New York 10036
                 Telephone: 212-209-4800

Facsimile: 212-209-4801
E-mail: dmolton@brownrudnick.com
E-mail: mkrzyzowski@brownrudnick.com

-and-

**SELENDY & GAY PLLC**
David Elsberg
Caitlin Halligan
Andrew Dunlap
Lena Konanova
Ron Krock
1290 Avenue of the Americas
New York, NY 10104
Telephone: 212-390-9000
E-mail: delsberg@selendygay.com
E-mail: challigan@selendygay.com
E-mail: adunlap@selendygay.com
E-mail: lkonanova@selendygay.com
E-mail: rkrock@selendygay.com

*Attorneys for the Foreign Representatives*

# EXHIBIT A

*Redemption Payments Received by Defendants from Sentry*
*From April 17, 2007 Through November 19, 2008*

| Payment Date | Redemption Payment | Number of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+] |
|---|---|---|---|
| August 17, 2007 | $100,000.00* | 79.7764 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |
| August 17, 2007 | $259,986.51* | 207.4080 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |
| September 19, 2007 | $100,000.00* | 79.5294 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |
| September 19, 2007 | $190,607.87* | 151.5893 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |
| October 16, 2007 | $526,623.80* | 414.8160 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |
| January 17, 2008 | $51,541.68* | 39.9049 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |
| February 15, 2008 | $210,982.24* | 162.3264 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |
| February 15, 2008 | $525,315.46* | 404.1694 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |
| March 18, 2008 | $525,655.08* | 404.1694 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |
| May 15, 2008 | $274,891.07* | 209.0348 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |

*Redemption Payments Received by Defendants from Sentry*
*From April 17, 2007 Through November 19, 2008*

| **Payment Date** | **Redemption Payment** | **Number of Shares** | **Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+]** |
|---|---|---|---|
| June 17, 2008 | $411,628.15* | 310.4934 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |
| July 15, 2008 | $107,062.41* | 80.8061 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |
| July 15, 2008 | $256,189.35* | 193.3607 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |
| July 15, 2008 | $1,459,560.29* | 1,101.6130 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |
| July 15, 2008 | $13,478,539.74* | 10,173.0200 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |
| August 18, 2008 | $81,312.12* | 60.9352 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |
| August 18, 2008 | $432,854.75* | 324.3808 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |
| September 16, 2008 | $3,162.24* | 2.3530 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |
| October 15, 2008 | $224,101.67* | 165.9270 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |
| November 19, 2008 | $21,535.98* | 15.9552 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |

*Redemption Payments Received by Defendants from Sentry*
*From April 17, 2007 Through November 19, 2008*

| Payment Date | Redemption Payment | Number of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+] |
|---|---|---|---|
| November 19, 2008 | $96,230.14* | 71.2933 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |
| November 19, 2008 | $108,231.70* | 80.1848 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |
| November 19, 2008 | $215,145.60* | 159.3933 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |
| November 19, 2008 | $279,070.83* | 206.7531 | JP Morgan Chase Bank N.A. a/k/a Chase Manhattan Bank, New York |

* Denotes Redemptions in the Sentry Vulnerability Period.

[+] Whether or not Redemption Payments were ultimately directed to bank accounts in the United States, all Redemption Payments from Sentry went through a correspondent bank account that Sentry's administrator maintained in the United States, and to the extent that any such Redemption Payments were directed outside the United States, they went through a correspondent bank account in the United States identified by shareholders for such payments.